## Joblin v. Joblin.

*Divorce—Cruel and barbarous treatment and indignities—Libel by husband.*

Where an analysis of the testimony indicates that the husband (libellant) was continually nagged and harassed by the respondent; that on one occasion she slapped his face, broke his glasses and threw dishes at him, and refused to permit him to enter the house when he came home at 11 P. M. from a lodge meeting; that, on another occasion, after a quarrel, she struck him with a cane and threw iodine over him, burning his face, neck and hands, and threatened to shoot him, asserting that she would go free as Mrs. Rosier had done; that she created scenes wherever she met him, had him arrested and accused him repeatedly of infidelity without any ground; and that the effect of her conduct upon him was to harass him so that his hair turned gray and he lost his business, the recommendation by the master in favor of the divorce will be approved.

Exceptions to master's report. C. P. No. 5, Phila. Co., Sept. T., 1923, No. 1621, in Divorce *a. v. m.*

*H. Shapiro*, for libellant.

*Golder & Felger* and *Everett A. Schofield*, for respondent.

SMITH, J., June 27, 1927.—This is an action in divorce, wherein the charges for the causes of divorce are: *(a)* Cruel and barbarous treatment; *(b)* indignities to the person. The master recommends that a decree in divorce be granted, to which exceptions have been taken by the respondent.

This case was very strenuously contested. The master held a number of meetings. The parties were married in Philadelphia on Dec. 6, 1892. They resided in this jurisdiction for over a year. From that point until Sept. 7, 1923, when the libellant left the respondent at their last residence, No. 5418 Chancellor Street, in the City of Philadelphia, they resided in twenty different places and in several cities. The master finds that the residences of both the libellant and respondent are *bona fide*. The libellant is fifty years of age, and at the time of the marriage was engaged as a sewing-machine operator in a factory. He later became a contractor and shirt manufacturer. The respondent lived home with her parents until the time of the marriage.

There were four children born as a result of this marriage, of whom only one is living. He is now twenty-eight years of age and lives in Brooklyn, New York.

A reading of the testimony discloses the fact that the libellant and respondent were married almost thirty-one years before the filing of the libel. They had married after having known each other for about three years. Both are of Russian-Jewish parentage. From a rather humble origin as an operator in a shirt factory, the libellant became a manufacturer, having his own factory at 11th Street and Washington Avenue, in the City of Philadelphia. According to his testimony, he has since found the business to be unprofitable and has been forced to close the factory.

The libellant testified as to a course of conduct on the part of the respondent extending over the course of their married life. The respondent is charged with many things, such as being too extravagant, running around making trouble with other people, continually fighting and bickering with the libellant, throwing dishes at him, forcing the aged mother of the libellant out of their home and refusing to permit the libellant to have his mother buried from their home, spending her vacations at the seashore when the business of the libellant was so bad that he could not afford to pay for such extravagance. The libellant furthermore testified that the respondent on one occasion slapped his face and broke his glasses and refused to permit him to enter the house

Joblin v. Joblin.

because he came home at eleven o'clock from a lodge meeting, and on the same occasion she opened the door and threw dishes at him. The next day, when he attempted to leave their home, the respondent, clad only in a bathing-suit, got into the taxicab with him and in the presence of crowds at the station forcibly restrained him from boarding the train.

There was testimony that the respondent charged the libellant on many occasions with running around with other women, and particularly mentioned her married son's mother-in-law. On one occasion the respondent had the libellant arrested; on another occasion, when the libellant objected to the respondent smoking a cigarette and knocked it out of her hand, he testified that she was sitting at the table with him and she threw all the dishes on the table at him and ran to the china closet for the purpose of getting more. On another occasion, after a quarrel, the libellant testified that the respondent called up the police station at 55th and Pine Streets and advised them that a woman had been killed in the house by her husband. When the police arrived, she asked them to arrest the libellant, stating that he had struck her and threw things at her. When the police officer refused to arrest the libellant, respondent seized a cane from the hall-rack and struck the libellant with it. During the same quarrel libellant testified that the respondent threw iodine upon him, burning his face, neck and hands, and threatened to shoot him, claiming that she would go free, as Mrs. Rosier did.

About this time the relatives of the libellant and respondent attempted to effect a reconciliation, and on July 19, 1921, a paper was prepared which was signed by the parties and duly witnessed by some of the relations, in which was stated:

"I, Hyman Joblin, and I, Ida Joblin, do hereby agree that all past grievances and quarrels are forgiven and forgotten and that our future existence shall be one of joy and happiness and furthermore nothing shall be said by either one of us about any other person or persons and we shall conduct ourselves as man and wife."

This writing, according to the testimony, was of no effect. The libellant testified that the respondent spoke in derogatory terms about the son's fiancé (whom he later married), both to the libellant, their relatives and neighbors, alleging that she had lived with some other man for three years. Libellant testified that by constant humiliations in the presence of strangers and relatives, making commotions and scenes, breaking his glasses, attacking him in his factory and on the street, she so affected his health that he was forced to go to the hospital. There is also evidence that, as the result of the treatment given him by the respondent, his hair became gray. At this point the parties separated. Later, the respondent caused the arrest of the libellant on the charge of assault and battery, although he was subsequently discharged by the magistrate.

The libellant further testified that later the respondent came to his room, annoyed his landlady, tried to break into his room, shammed illness and refused to leave, and that these disturbances continued down until the hearings conducted by the master.

The libellant produced several witnesses who testified as to different occurrences, when the respondent raised disturbances and made attacks upon the libellant.

The respondent took the stand in her own behalf and denied generally the acts alleged to have been committed by her. She most specifically stated that she had never struck her husband, but that he struck her, on one occasion knocking her unconscious. On another occasion she alleges the libellant struck

her because she attempted to grab certain letters from him while they were riding on the train coming from Cape May to Philadelphia.

The respondent, furthermore, charged her husband with immoral relations with Rose Goldman, the son's mother-in-law. Respondent also testified regarding a certain paper or agreement which she claimed was signed by the libellant. A sister of the respondent was called, who showed evidence of bad feeling toward the libellant. There were a good number of witnesses called by the respondent who also testified as to the constant quarrels between libellant and respondent. Several testified that libellant was very friendly with Mrs. Goldman. There is no evidence of any facts which would indicate that the libellant and Mrs. Goldman were guilty of any improper relations. The libellant admits that Mrs. Goldman on several occasions loaned him money for his business because of the relationship of his son and her daughter. The principal witness for the respondent was her son, Emanuel Joblin, who testified that he was the recipient of a batch of letters written by his mother-in-law, Mrs. Goldman, to his father, containing endearing terms, and that his father had promised to break off his friendly relations with her at the suggestion of the son. This witness testified that he heard his mother on many occasions charge his father with illicit relations with Mrs. Goldman. His father denied having such relations. This witness admitted, on cross-examination, that Mrs. Goldman had helped his father with money and that it was necessary for Mrs. Goldman to see his father in order to sign notes. He had never seen anything improper between his father and his mother-in-law, and he had seen only one agreement signed by the libellant and the respondent.

It requires a most careful reading of the testimony to ascertain where the truth of these stories may be. There is much conflict among them, and the testimony of many of the witnesses is tinctured by ill-feeling and bias. There is no doubt that the libellant and respondent for many years lived a life which was anything but happy. There is evidence from several of the witnesses that the latter years of their married life consisted of incessant quarreling and fighting. It would appear from a reading of the testimony that the respondent demanded certain luxuries and certain comforts which she never had before, and that the libellant was striving and endeavoring to build up a business and to succeed in the financial way. On account of the marriage of the son to Miss Goldman, there is evidence that libellant came into business contact with the mother-in-law of his son and that she loaned him money on many occasions for his business and took his notes therefor. It also appears that, notwithstanding the desires of the respondent to have her husband succeed in the business world, she resented the fact that the libellant had business relations with a woman, especially the mother of the young woman who had married her son. She thereupon accused these people of improper and immoral relations. There is no evidence to support her judgment. This continual quarreling turned the hair of the libellant gray, broke down his health, and he found himself financially embarrassed, subsequently losing his business.

An analysis of the testimony indicates that these parties were never happy. The libellant was continually being nagged and harassed by the respondent; she threw dishes at him and threw iodine upon him; she struck him with a cane, locked him out of his house and continually created scenes anywhere they met and at any time she felt like it; she had him arrested, and accused him of infidelity.

It is quite evident, from a reading of the record, that the testimony of the witnesses of the libellant and respondent cannot be reconciled, especially regarding the agreement, claimed by the respondent to have been executed

Joblin v. Joblin.

by the libellant, in which he promises to give up a certain woman for the rest of his life, not to meet her anywhere, not to disgrace his son and not to break up his home. The original of this paper was not produced in evidence. The master is of the opinion that the only paper that was ever signed was the original paper, marked Exhibit No. 1, wherein the libellant and respondent attempted to create a peace pact, which, however, was unsuccessful. The master stamps the paper, wherein it would appear that the libellant made an admission, as a "pure fiction, and its introduction into the case is indicative not only of the unreliability of the respondent's testimony, but also of the fact that the respondent will not hesitate at false testimony."

The master, furthermore, reports that during the taking of the testimony the respondent was a very nervous and excitable woman, and that she on many occasions interfered and hampered the master, the attorneys, the witnesses and the stenographer, and that she continued to heap abuses upon the libellant during the meetings. On one occasion she cursed at one of the witnesses.

This is not a case where the charge is constant bickerings and the ordinary altercations and quarrels that might occur among some husbands and wives. This is a course of conduct on the part of the respondent, running over many years, in which the respondent continually nagged, harassed, humiliated, threatened the libellant and on many occasions actually was guilty of doing bodily harm to the libellant. The respondent's course of conduct has been continuous and has lasted practically during their entire married life. While it is true that the findings of the master are not conclusive but merely for the information of the court, nevertheless, the master calls attention to the conduct of the respondent before him and makes reference to it in the following manner: "However, as we have pointed out, it was not a single instance but a continuance of these instances which of necessity must have had the effect of wearing down the resistance and vitality of the libellant. The master is more able to picture the effect from the fact that he was obliged to put up with some of the conduct continually during the taking of the testimony."

The fact that it was necessary to call relatives from other cities would indicate the seriousness of this matter.

In Breene v. Breene, 76 Pa. Superior Ct. 568, it is said:

"It is impossible to frame a definition of cruelty that will be of universal application. It has frequently been defined as actual personal violence, or conduct causing a reasonable apprehension of it, or such a course of treatment as endangers life, limb or health and renders cohabitation unsafe. In determining what conduct constitutes cruelty, regard must be had to the provisions of the statute and the circumstances of the particular case, keeping in mind always the physical and mental conditions of the parties and their social status.

"Any unjustifiable conduct on the part of either the husband or the wife, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as seriously to impair the bodily health or endanger the life of the other, or which utterly destroys the legitimate ends and objects of matrimony, constitutes cruelty, although no physical or personal violence may be inflicted, or even threatened or reasonably apprehended.

"Accusations of disgusting and degrading conduct . . . made by a wife against her husband are sufficient indignities to entitle him to a divorce."

In Ponthus v. Ponthus, 66 Pa. Superior Ct. 257, it was held: "It is also held to be cruel and barbarous treatment for a wife to charge her husband

with improprieties with other women, frequently throwing shoes, bottles, etc., at him, calling him vile and outrageous names, violently attacking him in the street, public restaurants and other places."

According to the opinion of the master, the libellant has made out a good cause of action, based upon the grounds of cruel and barbarous treatment and indignities to the person. A reading of the record substantiates the finding of the master.

Exceptions to the master's report are hereby dismissed and the report approved.